19444, 19449. VANDERGRIFF *v.* SHEPARD; and *vice versa.*

DECIDED JUNE 11, 1929.

*J. E. VanValkenburg Jr., Hendrix & Buchanan,* for plaintiff.
*Jones, Evins, Powers & Jones,* for defendant.

LUKE, J. Mrs. J. W. Vandergriff filed a claim against V. W. Shepard before the industrial commission of Georgia for compensation for the accidental drowning of her husband, J. W. Vandergriff. Commissioner Stanley held that Shepard had more than ten employees regularly in service in the same business, and that the accident arose out of and in the course of the employment of the deceased, and made an award in favor of the claimant. On review the full commission affirmed the findings of the commissioner; but on appeal the judge of the superior court set aside the award of the industrial commission "upon the ground that the evidence in the record is not sufficient to show that said V. W. Shepard was an employer having regularly in his service ten or more employees in the same business within this State."

Claimant excepted to the foregoing judgment, and the employer, by cross-bill, also excepted thereto. The gist of the cross-bill is that the said judgment limited the setting aside of the award to the single ground mentioned therein, whereas it also appears, from the evidence, that the death of Vandergriff did not arise out of and in the course of his employment.

On August 16, 1923, the Deaf and Dumb Association, acting by and through R. L. E. Rogers, put on an entertainment at East Lake in the City of Atlanta, consisting in part of a dinner served at about seven o'clock in the evening and of a pageant. Rogers arranged for some fireworks, dancing by professional dancers, and a float which was to be paddled across the lake. He employed V. W. Shepard, a decorator by trade, to construct and decorate this float, which was built on a platform placed upon three boats. Shepard commenced work on the float on August 15, 1923, and completed it the next day. At about nine o'clock in the evening of the 16th the float, occupied by six dancing girls, a deaf and dumb girl named Miss Morris, a man named Persons, J. W. Vandergriff, and the president of the Deaf and Dumb Association, left the shore. Vandergriff and Persons were paddling the raft. Rogers was ready to set off the fireworks, when he heard a commotion on the water, and the drowning occurred. Whether one of the boats leaked so that the three boats would not hold up the weight of the party, or whether the girls became excited and tilted the raft, Rogers could not say, he being on land and his vision being obstructed by automobiles.

Miss Nellie Sullivan, sworn for the claimant, testified: that she was a dancing teacher and a professional dancer; that she was employed to put on a dance for the carnival, and hired for that purpose six dancers; that V. W. Shepard never hired her or the girls; that the float was lighted, but that she was on the shore and could not see what was occurring on the float, because her view was obstructed by the crowd; and that neither the defendant nor Mr. Rogers had instructed her to keep quiet in regard to the tragedy. Miss Shirley Smiley, sworn for the claimant, testified: that she was Miss Sullivan's pupil; that she and the other dancing girls, the chairman of the convention, Mr. J. W. Vandergriff, and a boy in a bathing suit were on the float when it began to sink; that all the girls were supposed to be and, so far as she knew, were perfectly

still; that she remained on the float until it went down under her, and then she began to swim; that Miss Sullivan had told her not to mention the accident, because the girls "were playing another convention" soon, and it would make them afraid.

Mr. Fred Cooledge, sworn for claimant, testified: that he was a member of the Athletic Club, and understood that Miss Sullivan had been employed by the defendant to dance on the night in question, because at entertainments given by other organizations Shepard had done the decorating and arranged for girls to dance; that when witness arrived at the raft shortly after the catastrophe there was one other person on it; that witness dived four or five times from the raft and recovered the body of Miss Morton twenty minutes after the accident, and 112 feet from the shore; that Mr. Vandergriff's body was found at about 3:45 next morning, about twelve feet from where the body of Miss Morton was found; that defendant remained at the lake until they came in at five o'clock next morning; that on the way back to town defendant asked witness if he, defendant, could be held liable for any damages. The witness answered questions as to what defendant did at a Kiwanis entertainment, but his answers throw little or no light upon the issues in this case.

Fred O. Martin, for claimant, testified: that on August 16 and 17, 1923, he was working for Shepard in the decorating business; that on the night of the accident he helped fix and decorate the float; that witness and Isaac Farrar and another built the raft the day before the accident; that the middle boat leaked; that Mr. Vandergriff was Mr. Shepard's foreman and had charge of the construction work; that just before the raft started on its fatal trip, one Persons, whom Mr. Rogers had gotten to paddle the boat, came and took a paddle; that witness was to help paddle the boat, but that Vandergriff told him to stay on shore—that something might happen, and that he, Vandergriff, would row the boat; that the first day one Davis, Farrar, and witness were working on the raft, and the next day Mr. Vandergriff, Farrar, and witness; that Shepard generally had in his employ from two to eight persons; that during conventions Shepard had extra help, but that ordinarily he hardly ever had over four men and the office girl in his employ; that Mr. Vandergriff did all the hiring and firing; that defendant told Mr. Davis, witness, and Farrar to go out and fix the raft,

Mr. Davis being in charge because Mr. Vandergriff was in town; that Mr. Rogers selected the boats on which the raft was built; that one of the boats leaked, but witness considered the float safe, and was of the opinion that there must have been some "running around" to sink it; that the five regular employees of Mr. Shepard could do his work "when there wasn't nothing rushing . . , and part of the time these five were setting down doing nothing;" and that Mr. Vandergriff looked after things generally for Mr. Shepard.

Isaac Farrar, sworn for claimant, testified that he was working for Mr. Shepard, and helped build the raft, but that he was sitting in an automobile waiting for Mrs. Vandergriff, and did not see the accident. J. T. Gibson, sworn for claimant, testified: that he was a decorator and helped Mr. Shepard out on special jobs, but did not work regularly for him; that he was working for Mr. Shepard and helped build the raft on East Lake; that Mr. Rogers was present and gave instructions as to how the raft should be constructed; that Mr. Shepard was there "for a while," and that Mr. Shepard regularly employed four or five hands, and hired others when he got some big job.

V. W. Shepard testified: that Mr. Rogers hired him to do some decorating at East Lake; that Rogers told him just how the raft was to be built, and witness carried out instructions; that when the tragedy occurred witness had completed his work as decorator and let his employees go, and was helping Rogers purely for accommodation; that Rogers told witness that he wanted some one to help him operate the lights that were to be turned on the float, and that witness told Rogers that he might be able to get Mr. Vandergriff, but that he, Rogers, would have to pay him for half a day's work for working at night; that upon Rogers' request, witness saw Vandergriff, who agreed to help Rogers for the pay offered; that Rogers told witness one of the men "for the boat" had not shown up; that witness said his men were all off, but that he would see if any one of them was about who would help with the boat; that witness approached Martin, who said he would go on the raft; that it later developed that Vandergriff went on the float and Martin remained on shore; that witness had finished his job and neither Vandergriff nor Martin was working for him at the time; that witness had nothing whatever to do with Vandergriff's going on the

raft, and did not see it start; that he never had in his regular employ more than three or four hands, and that he hired extra help when he got a very big job; that witness was paid $100 for decorating at the Ansley Hotel and for his work at the carnival; that he carried no liability insurance at the time the accident occurred, because he did not employ ten men regularly; that he took out such insurance, he thought, about a month after the accident; that he employed more than ten, but not over fifteen men during the Pure Food show, and as many as twenty-five at the Elks' Convention; that he did not think he employed over ten persons during the Kiwanis convention, and that he employed less than that number at the laundrymen's convention; that at the time of the trial he had only three or four persons regularly employed; that witness called on Mrs. Vandergriff and told her that her husband was missing and he did not know where he was (one witness had sworn that he thought he saw Vandergriff returning to the shore in a boat after the float sank, and this created some doubt as to what had become of the deceased); and that witness did not tell Mrs. Vandergriff that he saw her husband and Fred Martin, and Fred did not want to go "out there," and that witness then said, "Well, it's up to you."

Mrs. Vandergriff testified that Shepard came to her house and made a statement to her. We quote her language as follows: "He came out there and told me this boy was supposed to run on the raft with Mr. Persons, the boy who was supposed to do so did not show up, and that he went to Van and says, 'What are we going to do? Now we have got to run it.' So he said, 'You go out on the raft, and I will run the lights.'"

Counsel agreed that Shepard was paying J. W. Vandergriff $6 a day for his services at the time of his death, and for some time prior thereto, or an average weekly wage of $36.

It appears from the commissioner's record that V. W. Shepard took out liability insurance with the Georgia Casualty Company on August 20, 1923, just four days after the accident.

Extracts from the time-book of J. W. Vandergriff, used while in the employ of V. W. Shepard, were introduced in evidence. "Exhibit A," headed "Pure Food Show," and undated, shows that twenty-three persons were hired, one for seven days, two for "full week," two for four and a half days, and the rest for periods

varying from half a day to three and a half days. Immediately following the above in the same time-book is a statement showing that fifteen persons worked, two for seven and a half days, one for seven days, two for six and a half days, one for six days, two for four days, and the rest for periods of time varying from a half day to one day. The next group, headed "Same book (presume third week following Pure Food Show)," discloses that thirteen persons worked, five for seven days, one four days, one for three and a half days, three for three days, and three for a half day each. The next group, headed "Immediately following—same book," shows that thirteen persons worked, one for six and three quarters days, one for six and a half days, three for six days, one for five and a half days, one for three days, and the rest for less than three days. The next group, headed "Book 1—Week ending May 12, 1923," discloses that eleven persons worked, one six and three quarters days, six for six and a half days, and the others from one day to three and a half days. The next group headed "week following," shows that fourteen persons worked, four for eight days, three for seven days, one four and a half days, and one for three days. The time worked by the others is not stated. The next group, headed "week following—in same book," shows sixteen persons, four working eight and a half days, one working seven days, one working five and a half days, two working four and a half days, one working four days, and the others for lesser periods of time. The time of one Pemberton is not given, but he appears to have been paid $24. The next group, headed "Week following—in same book," shows that eleven worked, five for seven and three quarters days, one for seven and a quarter days, three for six days, one for two days. Lewis Bullard, whose time is not given, was paid $3.75. The next group, headed "Week following," shows that twelve persons worked, six for seven days, four for six days, one for five and a half days, and one for five days. The next group, headed "Week following," shows that eleven persons worked, two for six and a half days, eight for six days, and one for four and a half days. The next group, headed "Week following," shows that eleven persons worked, one for six days, one for five and a half days, three for four and a half days, and the remainder for lesser periods of time. The next group, headed "Week following," shows that ten men worked, one for six and a half days, two for five and a half

days, one for six days, two for five days, two for four days, and one for two days. The next group, headed "Exhibit B. To date given in Book II," shows that twenty-one persons worked, three for eight days, one for six and a half days, three for six days, one for five days, one for four and a half days, one for four days, and the others for periods of time ranging from one to one and a half days. The next group, headed "week following Exhibit B, Book II," shows that fifteen persons worked, two for seven days, one for six and a half days, two for six days, two for five days, seven for three days, and one for one day. The next group, headed "Exhibit C, no date given—in Book III," shows that sixteen persons worked, three for eight and a half days, one for seven days, one for five and a half days, one for five days, one for four and three quarters days, and the others for periods ranging from one and a half to three and a half days. The next group, headed "Exhibit D, no date given—in Book III," shows that eleven persons worked, two for eight days, one for seven days, one for four and a half days, one for four days, one for three days, one for one and a quarter days, and four for one day. The next and last group is headed as follows: "Exhibit F, dated July 7, 1923, in Book II." It appears from it that twenty-five persons worked, two for ten and a half days, one for ten days, one for nine and a half days, two for eight and a half days, two for eight days, two for seven days, one for six and a half days, one for five and a half days, three for five days, two for four days and the others for lesser periods of time.

In two of the groups referred to above more than ten persons worked a full week. In the others, fewer than ten persons worked full weeks.. In very many instances the employees worked less than half a week. In most cases the time when the work was performed can not be satisfactorily ascertained. The last pay-roll is dated July 7, 1923, and the accident in which Vandergriff lost his life occurred August 16, 1923. It clearly appears from the record that the dancers at the entertainment were not in Shepard's employ, and that he did not regularly employ dancers in his business. All the oral evidence is to the effect that he did not regularly employ as many as ten persons and we do not think that the extracts from the time-books, together with the fact that Shepard took out liability insurance shortly after the accident, meet the requirements of section 15 of the workmen's compensation act (Ga. L. 1920, p. 167),

which provides that the act shall not apply "to any persons, firms, or private corporation, including any public service corporation, that has regularly in service less than ten employees in the same business within this State; unless such employees and their employers voluntarily elect to be bound by this act."

Therefore the evidence fails to show that the industrial commission had jurisdiction of the claim; and the judge of the superior court correctly so held. In view of the conclusion reached, it is not necessary to discuss the cross-bill of exceptions.

*Judgment on main bill affirmed; cross-bill dismissed. Broyles, C. J., and Bloodworth, J., concur.*